Yosh SAKAMOTO, Pacific Gift Supply, Inc., Top Liquor, Inc., Hakubotan, Inc., Jenny's Fashion, Inc. and Para Para, Inc., all Guam Corporations, Plaintiffs,

v.

DUTY FREE SHOPPERS, LTD., a Hong Kong Corporation, Guam Airport Authority, an autonomous instrumentality of the Government of Guam, Manuel F.L. Guerrero, in his official capacity as Executive Manager of the Guam Airport Authority, John Does I through V, in their official capacities as employees of the Government of Guam, Department of Public Safety, and the Government of the Unincorporated Territory of Guam, Defendants.

Civ. No. 82–0009

United States District Court,
D. Guam,
Civil Division.

Dec. 7, 1983.

William Fitzgerald, Saipan, CNMI, for plaintiffs.

Thomas C. Sterling, Klemm, Blair & Barusch, Agana, Guam, for Duty Free Shoppers.

Weil, Gotshal & Manges, New York City, for defendants.

Richard Pipes, Carbullido & Pipes, Agana, Guam, for defendants Guam Airport Authority and Manuel F.L. Guerrero.

Richard Opper, Atty. Gen. of Guam, Agana, Guam, for defendant Government of the Unincorporated Territory of Guam.

## MEMORANDUM ORDER

DUENAS, District Judge.

### STATEMENT OF THE CASE

Plaintiffs[1] filed their original complaint in this action on February 8, 1982, and then filed an amended complaint on February 16, 1982. The Plaintiffs allege that beginning on or before December, 1976, and continuing to the present, the Defendants Guam Airport Authority and Duty Free Shoppers, Ltd., (hereinafter referred to as the "GAA" and "DFS," respectively) engaged in unlawful combination and conspiracy in restraint of interstate commerce by

---

1. The Amended Complaint was originally filed by six plaintiffs. However, the Court dismissed with prejudice the claims of three of those plaintiffs—Hakubotan, Inc., Jenny's Fashion, Inc., and Para Para, Inc.—by a court order dated January 10, 1983, for refusal to respond to DFS' First Set of Interrogatories and First Request of Production of Documents dated June 25, 1982.

entering into contracts which conferred upon DFS exclusive rights for the sale and delivery of certain merchandise at the Guam International Airport Terminal (hereinafter referred to as "GIAT") and by enforcing such contracts against the efforts of Plaintiff Pacific Gift Supply (hereinafter referred to as "PGS") to deliver merchandise at the GIAT.

The Plaintiffs further allege that this conduct has harmed them and that it violates Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1–3, 42 U.S.C. § 1983, 48 U.S.C. § 1471, the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States, and the Commerce Clause, Article I, Section 8, Clause 3 of the Constitution of the United States. Jurisdiction is invoked by the Plaintiffs pursuant to 28 U.S.C. §§ 1331, 1337, and 1343; and 15 U.S.C. §§ 15 and 26.

On May 16, 1983, Plaintiff "PGS" filed a motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure contending that the exclusive concession agreement between GAA and DFS and the enforcement of such agreement against the efforts of PGS to deliver merchandise at the GIAT violates Section 1 of the Sherman Act, 15 U.S.C. § 1, the Commerce Clause of the Constitution of the United States, the Equal Protection Clause of the Fourteenth Amendment to the Constitution, and "public policy".

The Defendants filed a cross-motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on May 19, 1983. The Defendants maintain that the exclusive contracts between GAA and DFS are lawful, reasonable and procompetitive. The Defendants, in their memorandum in support of summary judgment, addressed every claim set forth by the Plaintiffs in their complaint. The Plaintiffs, however, have not only failed to address certain arguments of Defendants, but have limited their claims to the exclusive delivery rights conferred to DFS by the GAA. This court will, therefore, limit its decision to claims relating to the exclusive delivery rights issue and dismiss the following claims which were not addressed by the Plaintiffs:

1) Claims pursuant to 42 U.S.C. § 1983 and 48 U.S.C. § 1471.

2) Claims pursuant to the due process clauses of the Fifth and Fourteenth Amendments.

3) Claims pursuant to the Fourth Amendment.

On August 19, 1983, the Plaintiffs filed a motion to amend responses to requests for admissions. The court heard the motion to amend responses to requests for admissions, the Plaintiffs' partial summary judgment motion and the Defendants' motion for summary judgment on August 30, 1983. The Plaintiffs were represented by William M. Fitzgerald; the Defendant "DFS" was represented by Jay N. Fastow and William J. Blair; the Defendant "GAA" was represented by Richard Pipes; and the Defendant Government of Guam was represented by Margaret E. Bean, Assistant Attorney General. The Court denied Plaintiffs' motion to amend admissions and took the other motions under advisement.

## STATEMENT OF FACTS

The Department of Commerce of the Government of Guam directly managed and operated the GIAT until 1975. In 1975, the Guam Legislature enacted Public Law 13–57, entitled the "Guam Airport Authority Act", creating the Guam Airport Authority ("GAA"), as a public corporation and autonomous instrumentality of the Government of Guam, to manage and operate the GIAT.

In 1967, the Government of Guam entered into an exclusive merchandise concession agreement with Jones & Guerrero Company with regard to the GIAT. In 1972, the exclusive merchandise concession agreement was assigned from Jones & Guerrero Company to DFS with the approval of the Government of Guam. In 1978, the GAA, by competitive bid, offered an exclusive concession at the GIAT for a term of fifteen (15) years with an option for the concessionaire to extend the conces-

sion for an additional five years. At this same time, the GAA was also engaged in planning the financing and construction of a new air terminal at the Airport. The construction was to be financed through the sale of revenue bonds, which were to be entirely supported by the payments under the 1978 concession agreement.

The GAA publicized the availability of the concession in the *Pacific Daily News*, the local newspaper on Guam, and the *Wall Street Journal* and made the bid open to any party who could meet the following qualifications set forth by the GAA:

"... being in existence for 5 years, at least 3 years immediate prior experience operating similar airport concessions with annual volume $10 million and financial strength to provide unconditional minimum guarantee, advance cash deposit and start-up capital including all tenant improvements ... [with] [m]inimum acceptable guarantee [of] $15 million with 10 percent advance cash deposit...."

A few parties were interested in the exclusive concession but DFS submitted the highest bid (over $140,000,000.) and was awarded the exclusive concession at the GIAT. The concession agreement was executed between GAA and DFS on October 18, 1978. It should be noted that the Plaintiffs did not make a bid, did not object to the bid qualifications set forth by the GAA, and did not seek to influence the GAA to offer sale or delivery privileges on a non-exclusive basis.

On the basis of the guaranteed fees from DFS under the 1978 concession agreement, the GAA sold $43 million in revenue bonds in 1979. Using the funds it received from the sale of these bonds, the GAA began constructing a new terminal complex at the Airport in 1980. The new airport terminal was completed and opened for beneficial occupancy on January 20, 1982, at a cost to GAA in excess of $50 million.

The Plaintiff, PGS, has attempted on numerous occasions to deliver its merchandise to the airport terminal. At first, the Plaintiff would sell its merchandise and accept payment from the tourist and then deliver it to the airport and check it in. In April, 1976, an attorney for DFS informed the airlines that the pre-check-in procedure violated FAA rules and the airlines discontinued this practice. From April until August, 1976, the candy was sold to the tourist and paid for, then delivered to the airport and carried to the check-in counters by PGS employees. The tourist would then pick up the merchandise and check it in.

On June 7, 1976, S.T. Leon Guerrero, Acting Executive Manager of the GAA, sent a letter to Mr. Yosh Sakamoto advising him to "immediately cease delivery of any merchandise to departing passengers at GIAT".

PGS continued the practice of delivering to the check-in counter between September, 1976, and February, 1977.

On February 2, 1977, David Tuncap, Executive Manager of the GAA, sent a letter to Mr. Yosh Sakamoto of PGS stating the following:

"It has again been brought to our attention that you are still delivering candy to departing passengers at the Guam International Air Terminal (GIAT). You were advised to cease delivery of any merchandise to departing passengers at GIAT by my June 7, 1976 letter which you received in August, 1977 [sic]. Therefore, I am again advising you to immediately cease delivery of any merchandise to departing passengers at GIAT. Furthermore, I have instructed our Operations Officers to evict you or your representative from the airport if you continue this practice.

To make myself perfectly clear, I will take all necessary measures under the law to protect the rights of tenants/concessionaires of the Guam Airport Authority (GAA)."

On the basis of Tuncap's instructions, PGS discontinued deliveries to the airport and instead delivered to the hotels. Then the candy was placed on the tour bus and PGS employees would off-load the merchandise and carry it to the check-in coun-

ter. This practice continued through 1978 and until February, 1979.

On March 14, 1979, Manuel F.L. Guerrero, Executive Manager of GAA, sent a letter to Mr. Sakamoto requesting PGS to cease delivery of goods to passengers or would-be passengers at GIAT. Mr. Sakamoto was further informed that this regulation applied to everyone, not just PGS.

Subsequently, PGS requested that the tour agents and bus drivers assist the tourists with their merchandise at the GIAT. The tour agents and bus drivers were then compensated by PGS for their service.

A letter dated March 10, 1980, was sent by the attorney for GAA notifying the attorney for PGS that the GAA has the authority to prohibit Sakamoto or PGS employees from delivering candy to departing passengers at GIAT pursuant to § 100.3 of Rules and Regulations of the GAA and has the further right to eject Sakamoto or PGS employees from the airport premises pursuant to § 100.6(B) of the GAA Rules and Regulations if they continue such practices.

Subsequently, this lawsuit was filed by the Plaintiffs.

## I. GOVERNMENTAL ACTION IMMUNITY

The Defendants maintain that the conduct challenged by the Plaintiffs, i.e., the granting and enforcing by the GAA of exclusive Airport merchandise delivery rights, is immune from antitrust scrutiny since such conduct is governmental action.

*The State Action Immunity Doctrine*

The Defendants initially contend that the conduct challenged by the Plaintiffs is immune from antitrust scrutiny under the *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) "state action" immunity doctrine. In *Parker, Id.,* the Su-

preme Court determined, after carefully reviewing the legislative history of the Sherman Act, that Congress intended the Act to restrain only private anticompetitive action, not state action directed by the legislature.

 It appears that the Plaintiffs and the Defendants are in agreement that the challenged conduct in this case is governmental action. The Plaintiffs, however, reject the Defendants argument that the *Parker* "state action" immunity doctrine applies to the Territory of Guam. This Court is in agreement with the Plaintiffs that the Territory of Guam cannot be considered a state for the purposes of determining the applicability of the Antitrust laws. It is apparent that the principle of federalism underlies the "state action" immunity doctrine. As the Supreme Court stated in *Parker, Id.* at 351, 63 S.Ct. at 313,

"[i]n a dual system of government in which under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress."

Thus, since the Eleventh Amendment to the Constitution of the United States does not encompass unincorporated territories, the Territory of Guam lacks the sovereignty of a state.[2]

*The Federal Action Immunity Doctrine*

 The Defendants also maintain that all federal agencies and instrumentalities are absolutely immune from antitrust scrutiny. *Sea-Land Service, Inc. v. Alaska Railroad,* 659 F.2d 243, 244 (D.C.Cir., 1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982); *Feldman v. Gardner,* 661 F.2d 1295 (D.C.Cir., 1981) *cert. granted, District of Columbia Court*

---

**2.** Since this Court has determined that the Territory of Guam cannot be considered a State within the context of the Antitrust laws, it will not address the two-prong test applied to independent political subdivisions of a State set forth in *California Retail Liquor Dealers' Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980).

i.e., (a) "the challenged restraint must be one clearly articulated and affirmatively expressed as state policy," and
(b) "the policy must be actively supervised by the State itself".

*of Appeals v. Feldman,* 458 U.S. 1105, 102 S.Ct. 3481, 73 L.Ed.2d 1365 (1982), and *vacated on other grounds,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); and *Webster County Coal Corp. v. Tennessee Valley Authority,* 476 F.Supp. 529, 532 (W.D.Kentucky, 1979). It follows that the Defendants then assert that the GAA and the Government of Guam are agencies and instrumentalities of the federal government and as such are absolutely immune from antitrust liability. The Plaintiffs, on the other hand, contend that the Territory of Guam should be treated as a municipality and, therefore, not entitled to antitrust immunity.

It is this Court's determination that the Government of Guam and, indirectly, the GAA, are federal agencies and instrumentalities for the purposes of the Antitrust law and that their challenged conduct is immune from antitrust scrutiny. Pursuant to the Organic Act of Guam, 48 U.S.C. § 1421a and § 1423a, Congress expressly created the Government of Guam and authorized it to regulate all matters of local concern. The Government of Guam, acting as an agent and instrumentality of the Congress in this respect, created the GAA as "a public corporation and autonomous instrumentality of the Government of Guam" (§ 62001 of the Government Code of Guam) "to acquire, construct, reconstruct, purchase, extend, improve, better, operate and maintain airports and related facilities for civil aviation purposes on Guam". § 62003 of the Government Code of Guam.

Although the Government of Guam granted the GAA broad discretionary powers, it is apparent to this Court that the Government of Guam was concerned with the financial stability of the Airport and expressly limited and restricted the GAA's authority in this particular area. First, the Government of Guam enacted a comprehensive statutory scheme to authorize and encourage the issuance of revenue bonds. § 62100 et seq. of the Government Code of Guam. Second, the Government authorized and required the GAA to "manage and operate the Airport in the most efficient manner consistent with the protection of the bondholder" and "to keep the Airport on a self-sustaining basis". §§ 62010 and 62114 of the Government Code of Guam. It is obvious that the main concern of the Government of Guam was to ensure the protection of the bondholder and financial stability of the Airport. In order to assure this necessary protection and stability, after consultation with its financial advisors, the GAA determined that it had to have guaranteed income from a merchandise concession for 15–20 years. (See affidavit of R.M. Stone at p. 4.) It is, therefore, apparent to this Court that the GAA was acting in accordance with the mandate of the Government of Guam when it entered into the exclusive Airport merchandise concession agreement with DFS. As previously stated, DFS submitted the highest bid, over $140,000,000, in guaranteed concession fees for a period of 15 years, (with an option for DFS to extend for an additional five years) and on the basis of such guaranteed fees the GAA was able to sell $43 million in revenue bonds to finance the construction of the new terminal complex at the Airport. If it were not for the exclusive nature of the concession, no firm would have bid the amount bid by DFS to secure the revenue bonds. (See affidavit of R.M. Stone, at p. 5.)

In addition, it is obvious that the Government of Guam contemplated the granting of the exclusive airport concession by GAA since the policy of exclusive merchandise concessions at the Airport has been continually and specifically approved by the Government of Guam. In 1967, the Government of Guam originally adopted the policy of exclusivity when it directly operated the airport and conferred exclusive concession rights to J & G Company. In 1972, the Government of Guam reaffirmed its policy of exclusivity by assigning the exclusive merchandise concession agreement from J & G Company to DFS. Finally, in 1979, at the request of the Governor, the Government of Guam, impliedly approved the policy of exclusive Airport delivery rights by adopting Resolution I–S, in which it expressed its approval of the

GAA's amendment of the exclusive concession agreement with DFS and authorized the sale of bonds which would be supported by revenues accruing under such agreement.

Thus, it is clear to this Court that with respect to the conduct challenged by the Plaintiffs, the GAA was acting as the alter ego of the Government of Guam in its capacity as a federal agency and instrumentality and is to be afforded the same immunity from the Antitrust laws.

The Court feels the need at this time to distinguish the case of *Hecht v. Pro Football, Inc.*, 444 F.2d 931 (D.C.Cir., 1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), upon which the Plaintiff has placed great reliance. In *Hecht*, the District of Columbia Armory Board was established by the Department of the Interior to provide a stadium for District of Columbia sports teams. The Board entered into a contract with the Redskins containing a restrictive covenant prohibiting the use of the stadium by any professional football team other than the Redskins for a period of 30 years. The United States Court of Appeals for the District of Columbia Circuit held that the Armory Board was not immune from antitrust liability. The Plaintiffs analogize Washington, D.C. to Guam and the Armory Board to the Guam Airport Authority. The Plaintiffs maintain that Washington, D.C. and the Territory of Guam are both local governments created by the United States Congress and that both the D.C. stadium Board and the GAA are local instrumentalities set up to administer public facilities under those local governments. Therefore, the Plaintiffs contend that the actions of the Government of Guam and GAA are not immune from antitrust liability.

A more recent case from the D.C. Circuit, however, has held that acts of the local Court of Appeals were immune from the antitrust laws, because that court was "plainly a federal instrumentality". *Feldman v. Gardner*, *supra* at 1307. The *Feldman* court distinguished and clarified its holding in *Hecht*, stating that the Armory Board was not immune from antitrust liability since it was commissioned to operate the stadium as a private venture.

The operation of the GIAT by the GAA can certainly not be characterized as the operation of a private venture. The GIAT is the only commercial airport on the island of Guam providing essential air service to the people of Guam. Additionally, tourism is a major industry on Guam and the airport system is essential to the tourism industry and its expansion. Thus, it is evident that the people of Guam are dependent upon the GIAT for their economic well-being and that the GAA as a public authority maintains and operates the GIAT in the best interest of the public.

With regard to the actions of DFS in relation to the immune conduct of the GAA and the Government of Guam, it is the determination of this Court that such actions of DFS also fall outside the purview of the Sherman Act's prohibition. *Medical Association of the State of Alabama v. Schweiker*, 554 F.Supp. 955, 966 (N.D.Alabama, 1983).

Thus, the challenged conduct of the GAA, the Government of Guam and DFS is immune from antitrust scrutiny.

*The Noerr-Pennington Doctrine*

■ The Noerr-Pennington doctrine provides that the efforts of private persons to influence the operation of government for their own economic advantage are immune from the operation of the antitrust laws. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); and *California Motor Transport Company v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

■ The Plaintiffs agree that the *Noerr-Pennington* doctrine immunizes lobbying efforts, but contend that this case is not covered by the doctrine since it involves a conspiracy between DFS and GAA evidenced by a written agreement which re-

sults in a restraint of trade. The Defendants reply that the claims filed against DFS by the Plaintiffs relate only to allegations that it influenced the GAA to execute and enforce the exclusive merchandise agreements.

Paragraph 21 of the Plaintiffs' Amended Complaint states:

"The aforesaid conspiracy consisted of a continuing agreement ... to obtain an exclusive dealing arrangement for concession sales and deliveries at the Airport, and to prohibit such sales and deliveries by any party other than Defendant Duty Free."

It appears to this Court that Paragraph 21 of the Plaintiffs' Amended Complaint sets forth exactly the type of efforts which are immune from antitrust scrutiny pursuant to the *Noerr-Pennington* doctrine. It is, therefore, the determination of this Court that even if DFS engaged in such efforts it is immune from antitrust liability.

However, as evidenced by the affidavit of R.M. Stone, the exclusivity of the Concession Agreement resulted from the GAA's unilateral decision to offer such sale and delivery rights on an exclusive basis. Thus, there was no active government involvement in restraint of trade, no concerted action and, therefore, no violation of Section 3 of the Sherman Act. *United States v. Colgate & Company*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

## II. STANDING

In addition to the challenged conduct of the GAA, the Government of Guam and DFS being exempt from antitrust scrutiny on the basis of the federal action immunity and the Noerr-Pennington doctrine, this Court further concludes that the Plaintiffs do not have standing to bring this action.

■ Title 15 U.S.C. § 15(a) (Section 4(a) of the Clayton Act) states as follows:

"... any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

In order to have standing under § 15, the Plaintiff must establish injury to his business or property that occurred by reason of an antitrust violation. The Plaintiff must further show that the loss to his business or property was caused by the alleged antitrust violation. *Solinger v. A & M Records, Inc.* 586 F.2d 1304, 1308–09 (9th Cir., 1978), *cert. denied*, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979).

*Legal Injury to Business or Property*

■ The GAA and the Government of Guam are fully empowered to regulate the commercial use of the Airport. In fact, without written permission from GAA, it is unlawful for anyone to use Airport premises for commercial purposes. Sections 3030.3 and 3039.5 of the GAA Rules and § 62013 of the Government Code of Guam. As the Plaintiffs admit, they have never received permission from GAA or the Government of Guam to sell or deliver goods at the Airport. Thus, the Plaintiffs, by reason of the exclusive merchandise concession agreements and their enforcement, have not been deprived of any legal right which they had previously and thus cannot claim any legal injury to their businesses or property.

Furthermore, the Plaintiffs have no right to conduct their businesses on others' property, [*Donovan v. Pennsylvania Company*, 199 U.S. 279, 26 S.Ct. 91, 50 L.Ed. 192 (1905) and *Export Liquor Sales, Inc. v. Ammex Warehouse Company, Inc.*, 426 F.2d 251 (6th Cir., 1970), *cert denied*, 400 U.S. 1000, 91 S.Ct. 460, 27 L.Ed.2d 451 (1971) ] and no right to deal with the GAA or the Government of Guam. See *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940).

Additionally, the GIAT is not, as the Plaintiffs contend, a facility which is essential to the ability of the Plaintiffs to conduct their businesses. As noted in *Hecht v.*

*Pro Football, Inc.*, 570 F.2d 982, 993 n. 45 (D.C.Cir., 1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978), a facility is essential to the ability of competitors to do business, where, without access to that facility, "all possible competition is by definition excluded". As evidenced by the Plaintiffs' admissions, they have businesses and have been able to conduct such businesses and earn profits without the use of the Airport to make their commercial deliveries. To permit the Plaintiffs to use the Airport to make their commercial deliveries is certainly not essential to their businesses; it would merely provide an added convenience to their customers.

Thus, the Plaintiffs have failed to establish any legal injury to their businesses.

*Antitrust Injury*

■■■ The second element necessary to establish standing is that a Plaintiff must show an antitrust injury, i.e., that he has been injured by a decrease in competition. *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). As the Defendants correctly argue, no one has the right to do business at GIAT without the written permission of the GAA; so by the GAA granting the DFS concession, competition has actually increased the sale of merchandise in Guam since such sale and delivery services provided by DFS at the Airport would have been non-existent. It must be emphasized that the Plaintiffs are being denied the use of the GIAT for collateral non-transportation purposes, i.e., to make commercial deliveries. They are not being deprived of the use of the GIAT for transportation purposes.

Thus, there has been no antitrust violation or injury.

*Causal Nexus between Antitrust Violations and Injury*

■■■ The Plaintiffs have failed to convince this Court that their purported injury was the result of the alleged unlawful conduct. When the 1967 concession agreement was awarded by the Government of Guam, the Plaintiffs' businesses were non-existent. In 1978, it was the unilateral decision of GAA, pursuant to its statutory authority, to grant an exclusive concession to insure the financial stability of the airport and the protection of the bondholders. Additionally, it was the Plaintiffs' failure in 1978 to offer bids or to submit proposals to the GAA in an attempt to influence the GAA to alter the terms of the exclusive concession.

Moreover, it is evident that the Plaintiffs do not have the financial ability to meet the 1978 bid qualifications established by the GAA for the exclusive airport concession and, therefore, are not able to engage in the business from which they maintain they were excluded.

Thus, the Plaintiffs have failed to establish a causal nexus between the alleged antitrust violation and the purported injury.

## ALLEGED UNLAWFUL CONDUCT IS REASONABLE

■■■ In order for a restraint of trade to be in violation of the antitrust laws, it must be "unreasonable" and anticompetitive. *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1381 (9th Cir., 1981), *cert. denied* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981) and *A.H. Cox & Company v. Star Machinery Company,* 653 F.2d 1302, 1305 (9th Cir., 1981). There are two rules which courts apply to determine whether conduct is unreasonable or anticompetitive. The first rule is the *per se* rule, i.e., that the conduct is unreasonable per se. The second rule is the rule of reason. *Ron Tonkin, supra.*

■■■ When a court applies the rule of reason test, it inquires as to the effect the challenged conduct has on competition. *Ron Tonkin, supra,* at 1388. If, however, the court identifies conduct which has been held to be unreasonable per se, it is barred from inquiring as to its reasonableness. In order for conduct to be conclusively presumed to be unreasonable, it must have a pernicious effect on competition and lack any redeeming virtue. *Northern Pacific*

*Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

■ The Plaintiffs maintain that the challenged conduct in the case at bar is unreasonable per se. This Court does not agree. First, there is a need to distinguish between horizontal restraints and vertical restraints. A horizontal restraint is an agreement between competitors to refuse to deal with one or more persons, while a vertical restraint involves combinations of parties on different levels of the distribution system. It has been held that horizontal restraints are unreasonable per se. *Ron Tonkin, supra.*

The Plaintiffs do not contend that the challenged conduct amounts to a horizontal restraint but they do contend that the challenged conduct is unreasonable per se since it is a vertical restraint that has the presence of a horizontal element. In other words, the Plaintiffs contend that through the concerted action of DFS and the GAA, the GAA has refused to deal with the Plaintiffs (competitors of DFS) and, hence, the per se rule should be applied. This Court, however, must reject this argument. As previously mentioned, the exclusivity of the Airport concession agreement did not result from concerted action between DFS and the GAA, but from the unilateral decision of the GAA to offer sale and delivery rights on an exclusive basis. Even if this Court infers that DFS and the GAA acted in concert, this Court is only justified in applying the per se rule if "the challenged conduct clearly had, or was likely to have, a pernicious effect on competition and lacked any redeeming virtue." *Ron Tonkin, supra* at 1387. Such is not the case. It has already been stated in this decision that competition has actually been increased by the GAA permitting DFS to conduct business on the GIAT premises and that the exclusive concession agreement was essential to the financial stability of the Airport and benefits the tourism industry and the economy of the people of Guam.

Furthermore, the exclusive concession agreement is reasonable as a matter of law because it was offered pursuant to an open and fair competitive bid. *Parmelee Transportation Co. v. Keeshin,* 292 F.2d 794 (7th Cir., 1961) *cert. denied,* 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961) and *Bustop Shelters, Inc. v. Convenience & Safety Corp.,* 521 F.Supp. 989, 997 (S.D.N.Y., 1981).

## III. THE STATUTE OF LIMITATIONS AND THE DOCTRINE OF LACHES

Finally, this Court determines that all claims filed by the Plaintiffs are barred by the four-year statute of limitations pursuant to 15 U.S.C. § 15b (Section 4B of the Clayton Act) and the doctrine of laches.

Title 15 U.S.C. § 15b states as follows: "§ 15b. Limitation of actions.

Any action to enforce any cause of action under sections 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued...."

It should also be noted that the above four-year statute of limitations period has been used by the Ninth Circuit as a guideline for the computation of the laches period in antitrust suits. *Aurora Enterprises v. National Broadcasting Co.* 688 F.2d 689, 694 (9th Cir., 1982).

*Statute of Limitations*

■ The Defendants maintain that the Plaintiffs' cause of action accrued in 1976 or at least in 1977, the date of the Defendants' final refusal to deal with the Plaintiffs, and thus, this action is barred by the four-year statute of limitations. In a case such as this, where the Plaintiffs' claim is based upon the Defendants' refusal to deal with it, i.e., to allow Plaintiffs the right to sell or deliver at the airport terminal, the Plaintiffs' cause of action accrued at the time the Defendants made a final refusal to deal and no new or continuing claims are created by subsequent iterations of that refusal to deal. *In Re Multi-district Vehicle Air Pollution,* 591 F.2d 68 (9th Cir., 1979), *cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979) and *David Orgell, Inc. v. Geary's Stores, Inc.,* 640 F.2d 936, 938 (9th Cir., 1981), *cert. denied sub.*

nom. *David Orgell v. Josiah Wedgwood & Sons*, 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981).

As evidenced by the Plaintiffs' complaint (Paragraph 22(b) and (m) of Plaintiffs' amended complaint), and the letter from S.T. Leon Guerrero, the Acting Executive Manager of the GAA, to Mr. Sakamoto dated June 7, 1976, the Plaintiffs have known since sometime prior to December, 1976, that their deliveries to the Airport were prohibited by the GAA. Even if Plaintiffs did not recognize the 1976 refusal to deal as absolute and final, it is evident that they recognized the refusal to deal as final in 1977. As stated in paragraph 22(c) of their complaint "...GAA forced Pacific Gift Supply to cease making delivery of any merchandise to departing passengers at the Airport in February, 1977". The 1977 final refusal to deal is further evidenced by the letter from David Tuncap, Executive Manager of GAA, to Mr. Y. Sakamoto, Pacific Gift Supply Company, dated February 2, 1977, in which the following was stated:

> "It has again been brought to our attention that you are still delivering candy to departing passengers at the Guam International Air Terminal (GIAT). You were advised to cease delivery of any merchandise to departing passengers at GIAT by my June 7, 1976 letter which you received in August, 1977 [sic]. Therefore, I am again advising you to immediately cease delivery of any merchandise to departing passengers at GIAT. Furthermore, I have instructed our Operations Officers to evict you or your representative from the airport if you continue this practice.

> "To make myself perfectly clear, I will take all necessary measures under the law to protect the rights of tenants/concessionaires of the Guam Airport Authority (GAA) ...."

Thus, the Plaintiffs' cause of action arose at least by 1977 and its claim filed in February, 1982, is barred by the four-year statute of limitations.

The Plaintiffs argue that their cause of action accrued in October, 1978, the date that the exclusive concession agreement between DFS and GAA was executed and thus is still within the four-year statute of limitations period. This Court does not agree. The Defendants' final refusal to deal was expressed at least by 1977, and the offer of the new exclusive airport concession in 1978 in no way detracted from its finality since the policy of exclusive airport concessions at the Airport has been continually and specifically approved and enforced by the Government of Guam and the GAA since 1967. Thus, the Plaintiffs had no reason to believe that the 1978 airport concession agreement would not be in conformity with the policy of exclusivity adopted by the GAA and the Government of Guam.

The Plaintiffs also contend that since they were hopeful of a work-out arrangement through March, 1980, their cause of action did not accrue until that time. This Court rejects this contention on the basis that the Plaintiffs cannot toll the running of the statute of limitations by claiming that they still had a hope of dealing with the Defendants. *Orgell, Inc., supra.*

*Doctrine of Laches*

 The Court also feels that this is an appropriate case to invoke the application of the doctrine of laches since the Defendants have been prejudiced by the five-year delay of the Plaintiffs in bringing this suit. More specifically, the Plaintiffs could have filed their suit prior to 1978, or in 1978 when the new airport concession agreement was up for bid. However, the Plaintiffs *chose to wait until* after DFS guaranteed fees in the amount of $140,000,000 in the concession agreement, the GAA sold $43 million in revenue bonds in 1979 supported by the fees from the concession agreement, the GAA began to build a new airport terminal complex in 1980, and the new terminal complex was completed in 1982 at a cost in excess of $50 million to the GAA. It would be inequitable to permit the Plaintiffs to attempt to invalidate the concession agreement at this time after

such a lengthy delay and after having allowed the Defendants to act in substantial reliance on the validity of such concession agreement.

## IV. COMMERCE CLAUSE

■ The Plaintiffs also maintain that the restriction on deliveries to the Airport is an unreasonable burden on interstate commerce in violation of the Commerce Clause, Article I, Section 8, Clause 3, of the United States Constitution. This Court determines that there is absolutely no merit to this contention since Article I, Section 8, Clause 3 of the United States Constitution has not been extended to Guam. 48 U.S.C. § 1421b(u).[3]

■ However, even if the Commerce Clause were extended to Guam, it is this Court's decision that the alleged conduct of the Defendants does not constitute an unreasonable burden on interstate commerce in violation of the Commerce Clause since, as previously mentioned, the Plaintiffs have no right to conduct their businesses at the airport terminal. Also, the fact that the GAA has permitted DFS to do business at the airport terminal has actually facilitated commerce. The guaranteed concession fees have provided the necessary revenues for the construction, maintenance and operation of the airport thus benefiting the tourism industry and the economic well-being of the people of Guam.

■ Additionally, since this Court has determined that the alleged conduct is immune from Sherman Antitrust scrutiny under the federal immunity doctrine, such conduct cannot be found to violate the Commerce Clause. The Congress in enacting the Sherman Antitrust Act has exercised its plenary commerce power to its fullest extent. *McClain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232,

241, 100 S.Ct. 502, 62 L.Ed.2d 441 (1979) and *United States v. American Building Maintenance Industries*, 422 U.S. 271, 278, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975). Thus, it follows that if the federal immunity doctrine is applicable to Sherman Act claims it is also applicable to a claim under the Commerce Clause. See *Western & Southern Life Insurance Co. v. State Board of Equalization of California*, 451 U.S. 648, 653, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981).

## V. EQUAL PROTECTION

Section 100.3 of the GAA rules and regulations states as follows:

> "No person shall carry on any commercial activity at the airport without the written consent of the authority."

The Plaintiffs maintain that the granting of the exclusive delivery rights to DFS was an arbitrary and capricious application of the regulation by the GAA which has created an invidious discrimination by denying use of the GIAT to one business while granting it to another in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

This argument must fail since the Plaintiffs have no right to conduct their businesses at the airport terminal and the exclusive concession agreement was granted pursuant to a fair and competitive bidding procedure. The Plaintiffs were not discriminated against; they merely failed to seek the exclusive concession when it was offered and further failed to offer a proposal to the GAA concerning the granting of non-exclusive delivery privileges.

■ Moreover, the equal protection law will not reach a situation where a government is engaged in economic regulation

---

**3.** Section 1421b(u) of Title 48 U.S.C.A. states in pertinent part as follows:

"(u) The following provisions of and amendments to the Constitution of the United States are hereby extended to Guam to the extent that they have not been previously extended to that territory and shall have the same force and effect there as in the United States or in any State of the United States: article I, section 9, clauses 2 and 3; article IV, section 1 and section 2, clause 1; the first to ninth amendments inclusive; the thirteenth amendment; the second sentence of section 1 of the fourteenth amendment; and the fifteenth and nineteenth amendments."

that is rationally related to a legitimate governmental interest. *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) and *Benson v. Arizona State Board of Dental Examiners,* 673 F.2d 272 (9th Cir., 1982).

In the case at bar, the granting of the exclusive airport concession by the GAA pursuant to its statutory authority passes the rationality test. The purpose of the exclusive concession was to maximize Airport revenues to expand and improve the operations of the Airport and ensure the financial stability of the Airport, thereby promoting the tourism industry and the economic well-being of the Territory of Guam. This Court concludes that the GAA and the Government of Guam could reasonably decide that in order to expand and improve the operations of the GIAT, keep the airport on a self-sustaining basis and protect its bondholders, that it needed to grant an exclusive merchandise concession agreement with guaranteed income from such concession for a period of at least 15 to 20 years to a party who could meet the bid qualifications set forth by the GAA. *supra,* pp. 384–385.

Thus, this Court determines that there is no denial of equal protection since the judgments of the GAA and the Government of Guam are rationally related to a legitimate governmental interest.

### CONCLUSION

There being no material issue of fact in dispute, it is the determination of this Court that the Defendants are entitled to their motion for Summary Judgment as a matter of law. To hold otherwise would result in a substantial loss of guaranteed concession fees for the GIAT[4] which, in turn, would have a devastating effect on the financial stability of GIAT, GAA's ability to operate, maintain and improve the Airport, tourism, the economy of Guam, and the people of Guam.

**4.** If there is an interruption or loss of any of the concessionaire's exclusive rights for a period in excess of sixty (60) days, the guaranteed fee to GAA in the amount of $140,000,000 will be

Thus, Plaintiffs' Partial Motion for Summary Judgment is denied and the Defendants' Motion for Summary Judgment is granted.

So Ordered.

reduced to an amount in no event greater than $74.1 million. Concession Agreement dated October 18, 1978, §§ 1.06, 7.01(e) and 7.02(b).