**ZAPATA GULF MARINE CORPORATION, etc.**

v.

**PUERTO RICO MARITIME SHIPPING AUTHORITY, et al.**

Civ. A. No. 86–2911.

United States District Court, E.D. Louisiana.

Feb. 26, 1988.

Joseph N. Mole, Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, La., for Zapata Gulf Marine Corporation.

J. Forrest Hinton, New Orleans, La., for Trailer Marine Transport Corporation.

Rutledge C. Clement, Jr., and Amelia J. Williams, New Orleans, La., for Sea–Land Service, Inc.

Gene W. Lafitte, Liskow & Lewis, New Orleans, La., Mario F. Escudero, Michael S. Kelly, Michael F. Clayton, Washington, D.C., for Puerto Rico Maritime Shipping Authority.

MENTZ, District Judge.

## MEMORANDUM OPINION

This is an antitrust lawsuit for treble damages[1] filed by plaintiff, Zapata Gulf Marine Corporation (Zapata), against defendants, Trailer Marine Transport Corporation, Sea–Land Service, Inc., and Puerto Rico Maritime Shipping Authority (PRMSA). PRMSA has moved this Court for summary judgment in its favor based upon the state action doctrine, the Local Government Antitrust Act of 1984, and the Eleventh Amendment to the United States Constitution.

### State Action Doctrine

■ Under the state action doctrine, the anticompetitive activity of a state is exempt from the federal antitrust laws. The doctrine, which is an implied exemption based upon principles of federalism and state sovereignty, was first enunciated by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).[2] It is not necessary to recount the Court's opinion in *Parker* or its progeny, as more than ample space and time have been devoted to that subject already. For the purposes of the present motion, it will suffice to summarize that PRMSA will have state action immunity if the alleged anticompetitive conduct was contemplated by the Puerto Rico legislature and performed pursuant to a governmental policy to displace competitive market forces. *See City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 413–415, 98 S.Ct. 1123, 1137–1138, 55 L.Ed.2d 364 (1978).

Contrary to PRMSA's argument, PRMSA is not absolutely immune from antitrust liability under the state action doctrine. In support of its argument, PRMSA relies on *Limeco, Inc. v. Division of Lime of the Mississippi Department of Agriculture & Commerce*, 778 F.2d 1086 (5th Cir. 1985), wherein the Fifth Circuit found that The Division of Lime of the Department of Agriculture was "indisputably, an enterprise undertaken by the State ...", and therefore, not subject to the Sherman Act. *Id.* at 1087. This statement does not constitute a finding that The Division of Lime is the State, or acts as a sovereign entity. The plaintiff in *Limeco* claimed that The Division of Lime was guilty of monopolization of the lime business. However, the operation of lime plants and the supply of crushed limestone to farmers at cost were required by the Mississippi legislature. As stated by the Court, the State of Mississippi "entered the lime business" in 1942 when the legislature created The Division of Lime. *Id.* at 1086. Thus, when read in the context of the entire opinion, the statement PRMSA relies on must be read to mean that the lime business conducted by The Division of Lime is immune because the State, through its legislature, has "undertaken" or decided to engage in that "enterprise" or business.

In this respect, *Limeco* is similar to *Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping Authority*, 475 F.Supp. 711 (D.D.C.1979), *aff'd*, No. 79–1658 (D.C.Cir.1980) (per curiam), *cert. denied*, 450 U.S. 914, 101 S.Ct. 1355, 67 L.Ed. 2d 339 (1981). The defendant in *Caribe* is the same defendant in the case at bar. In *Caribe*, the plaintiff challenged PRMSA's acquisition and operation of shipping lines as an attempt to create a monopoly in ocean transportation between the East and Gulf Coasts of the United States and Puerto Rico. The Court recognized that state instrumentalities "are not exempt from the application of the antitrust laws simply by

---

1. There is no claim for injunctive relief.

2. The doctrine is sometimes referred to as the "*Parker* doctrine" or "*Parker* immunity."

virtue of their status as governmental entities." *Id.* at 720. *See also Star Lines, Ltd. v. Puerto Rico Maritime Shipping Authority,* 451 F.Supp. 157, 161 (S.D.N.Y. 1978), ("it is clear that PRMSA is not entitled to avail itself of the *Parker* immunity 'simply by reason of' its status as a state instrumentality ...."). However, the Court held that PRMSA's acquisition and operation of shipping lines was immune from antitrust liability because such activity was mandated by the Puerto Rico legislature.

Both *Limeco* and *Caribe* involved challenges to the basic existence and essential operations of a state instrumentality. Neither case found that the instrumentality involved was absolutely immune. Instead, both courts looked to whether the legislature permitted the challenged conduct. Both The Division of Lime and PRMSA were protected by the state action doctrine because their lime and shipping operations were established at the direction of the state, through its legislature.

The court in *Star Lines, supra,* another case involving PRMSA, engaged in the same analysis, yet correctly reached a different result. In *Star Lines* the conduct complained of, PRMSA's lease of a vessel for use in the Persian Gulf trade "in a line of commerce unrelated and far removed from the shores of Puerto Rico," was not contemplated by the legislature or conducted pursuant to a governmental policy to displace competition in that area. *Id.* at 167–168. Accordingly, the court held that PRMSA's activities in the Persian Gulf were not immune from antitrust liability. *Id.* at 168.

Clearly, in view of the foregoing discussion, PRMSA is not absolutely immune under the state action doctrine. It does not act as a sovereign governmental entity such as a state legislature or Supreme Court. Whether PRMSA is exempt from antitrust liability in the case at bar will depend upon the nature of the activity challenged and PRMSA's legislative authority.

■ PRMSA is a government agency organized by the Commonwealth of Puerto

Rico[3] in 1974 to operate Puerto Rico's maritime transportation system. The decision in *Caribe* gives the following summary of PRMSA's formation:

Because of its small size, insular position, and limited natural resources, Puerto Rico has difficulty in maintaining a self-sufficient economy and is dependent on external trade for economic and social development. Ocean transportation carries more than ninety-eight percent of its external trade and as a result, ocean freight costs exert a potentially disruptive influence of all aspects of Puerto Rico's economy. Trade between East Coast and Gulf ports represents the major avenue of traffic between Puerto Rico and the mainland United States and accounts for approximately eighty-five percent of all dry cargo transported and over seventy percent of Puerto Rico's total external trade.

Because of the island's dependence on ocean transport, the Governor of Puerto Rico in 1973 established a commission to determine whether the Commonwealth should take steps to acquire the vessels then employed by commercial steamship companies in the Puerto Rico trade. This acquisition was intended to assure the availability of vessels and to maintain price stability with respect to transportation costs. Following negotiations with the three major carriers, the commission proposed legislation that would establish a nonstock public corporation to own or lease the vessels and equipment necessary to conduct the Mainland–Puerto Rico trade. On June 10, 1974, the Commonwealth legislature enacted this proposal as Act 62 and created the Puerto Rico Maritime Shipping Authority as a governmental instrumentality to operate Puerto Rico's maritime transportation system. [Footnote omitted].

PRMSA, which is incorporated in Puerto Rico, consists of a governing board of seven members, all of whom are residents of Puerto Rico, appointed by the Governor with the advice and consent of

---

**3.** There is no dispute that Puerto Rico is a state for purposes of applying the state action doctrine.

the Puerto Rico Senate. Its operations are exempt from taxation and from all fees required for the prosecution of judicial proceedings. The Statement of Motives contained in Act 62 expresses the intent of the Puerto Rico legislature that PRMSA acquire and operate shipping lines and terminal facilities as a public service and, in doing so, that it not be subject to the antitrust laws or any other limitations that would hinder its legislative goal. [Footnote omitted].

*Caribe,* 475 F.Supp. at 713–714. *See also* Affidavits of Teodoro Moscoso, Chairman of the Governing Board of PRMSA, and Esteban Davila Diaz, First Executive Director of PRMSA from 1974 to 1977, and from 1985 to present, in support of PRMSA's motion for summary judgment.

Zapata, as the assignee of American Caribe Lines, Inc. (AmCar),[4] filed the present lawsuit alleging that PRMSA charged predatory rates for its services and conspired with two private parties to exclude AmCar from the Puerto Rico–United States ocean transportation market. PRMSA argues that even if it is not entitled to absolute immunity, Zapata's antitrust damage action would nonetheless be barred because PRMSA's alleged anticompetitive activities were authorized by the Commonwealth of Puerto Rico pursuant to a clear governmental policy to displace competition.

Section 3052 of the Act creating PRMSA[5] provides a clear statement of public policy:

The Legislature finds and determines that in order to insure that the citizens of the Commonwealth of Puerto Rico have an adequate and inexpensive supply of basic commodities, and to foster the development and expansion of trade and industry within the Commonwealth, all of which is essential to the economic growth of the Commonwealth, and to the full employment and prosperity of its citizens, it is necessary to maintain a com-

plete, reliable and economical maritime transportation system for cargo and passengers between Puerto Rico and abroad. It is the purpose of this chapter to provide the means for establishing and maintaining a maritime transportation system for the benefit of the people of the Commonwealth, and for the protection of their health and welfare.

Thus, the legislature directed PRMSA to establish and maintain a "complete, reliable and economical maritime transportation system." To that end, the Act gave PRMSA "all powers necessary or convenient to carry out and fulfill the purposes and provisions of [the] Act." *See* Act, § 3055; *Star Lines,* 451 F.Supp. at 166–167. It is not necessary that the legislature direct PRMSA to engage in a specific anticompetitive act such as predatory pricing. In order for state action immunity to apply, it is sufficient that the legislature directed PRMSA to engage in a particular type of activity. Here, that particular type of activity was the maintenance of a complete and reliable marine transportation system. *Cf. Caribe,* 475 F.Supp. at 721–722.

The challenged conduct in this case—PRMSA's alleged predatory pricing and conspiracy with private parties to exclude a competitor from the market—was designed to further the express legislative mandate that PRMSA ensure complete and reliable carrier service, and was performed pursuant to a governmental policy to displace competition. It has already been found that the Puerto Rico Legislature mandated PRMSA to "take over" the shipping trade. *Caribe,* 475 F.Supp. at 723. Certainly the legislature contemplated PRMSA undertaking action which would serve to maintain its position of control. The fact that some of PRMSA's activities might be anticompetitive is obvious. The Act creating PRMSA provides for broad antitrust exemptions.[6] In and of themselves the legislative exemp-

---

4. A defunct New York corporation that was engaged in the containerized freight market between Jacksonville, Florida, and San Juan, Puerto Rico from March, 1984 to November, 1984.

5. Act of Puerto Rico Maritime Shipping Authority, Act. No. 62 (June 10, 1974).

6. The Act, § 25 contains the following blanket antitrust exemption:

Insofar as the provisions of this Act are in conflict with the provisions of any other law, or parts thereof, the provisions of this act shall prevail. Specifically, and without otherwise limiting the generality of the foregoing, it is intended by this act that the Anti–Trust

tions cannot confer antitrust immunity on PRMSA; however, they do "indicate that some anticompetitive activity on PRMSA's part was contemplated in order to carry out the provisions of the Act." *Star Lines,* 451 F.Supp. at 166–167; *see also Parker,* 63 S.Ct. at 314 ("a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful").

If PRMSA is to maintain itself as a complete and reliable carrier, it cannot be undermined by a competitor. The Governor of Puerto Rico annually provides a letter to PRMSA's auditors reaffirming that Puerto Rico "now and in the future will remain actively committed to all measures which will enhance the Authority's economic viability, since PRMSA's continued capability to serve the commercial needs of Puerto Rico is essential to the well-being of our Island and its people." Thus, PRMSA's acquisition of the assets of the major carriers operating at the time of its creation was held to be immune from antitrust liability in *Caribe.* Such activity was undertaken pursuant to a governmental policy to displace competition in order to ensure complete and reliable carrier service. *Id.* at 723. But, PRMSA need not resort to buying out every newcomer to the market in order to carry out its purpose and may instead use other means to displace competition. Indeed, the fact that PRMSA might engage in the activity complained of was a reasonably foreseeable consequence of the governmental policy to displace competitive market forces and PRMSA's statutorily required duty to maintain a maritime transportation system. Thus, PRMSA's alleged anticompetitive activities are immune from antitrust liability under the state action doctrine.

PRMSA alternatively argues that the Local Government Antitrust Act of 1984

(LGAA) and the Eleventh Amendment to the United States Constitution bar Zapata's antitrust damage claims against PRMSA. Having already determined that PRMSA is immune from antitrust liability for the actions which are the subject of Zapata's complaint, it is not necessary to discuss PRMSA's alternative arguments. However, in the interest of completely adjudicating all issues raised in PRMSA's motion for summary judgment, the Court will address the merits of these issues.

### Local Government Antitrust Act of 1984

The LGAA, 15 U.S.C. §§ 34–36, is an extension of the *Parker* doctrine (discussed *supra*), and was adopted to prohibit damages from being assessed against local governments for antitrust violations. *See Jefferson Disposal Company, Inc. v. Parish of Jefferson, Louisiana,* 603 F.Supp. 1125, 1129 (E.D.La.1985). Section 3(a) of the LGAA states that "[n]o damages, interest on damages, costs or attorney's fees may be recovered under section 4, 4A or 4C of the Clayton Act (15 U.S.C. 15, 15a or 15c) from any local government, or official or employee thereof acting in an official capacity."

■ A local government is covered by the LGAA regardless of whether it acted within its lawful regulatory authority. *See Palm Springs Medical Clinic, Inc. v. Desert Hospital,* 628 F.Supp. 454, 458–64 (C.D.Calif.1986). Congress prohibited the recovery of antitrust damages against local governments based on the policy that "taxpayers should not be forced to bear the treble damage remedies recoverable from local governments under extant law, and on the belief that local governments should not be forced to spend public funds in defending baseless antitrust suits." *Id.* at 461–462.[7]

Laws shall not be applicable to any action of the Authority taken pursuant to the provisions hereof.

Similarly, the Statement of Motives in the Act provides that:

The Legislature of Puerto Rico intends that this instrumentality acquires and operates shipping lines and terminal facilities as a public service, and that in doing so, it shall not be subject to the antitrust laws nor any other

limitation that could hinder the effective discharge of the endeavor that this act has imposed on the public instrumentality hereby established.

7. Congress preserved the right of persons injured by anticompetitive conduct to seek injunctive relief against local governments, *Id.* at 461–464; however, as previously stated, there is no claim for such relief in the case at bar.

The question presented is whether PRMSA is a "local government" as defined by the LGAA. The term "local government" is defined as "a city, county, parish, town, township, village, or any other general function governmental unit established by State law" *or* "a school district, sanitary district, or *any other special function governmental unit* established by State law in one or more States." LGAA, § 2(1)(A), (B) (Emphasis added).

PRMSA argues that it is a "special function governmental unit" for purposes of the LGAA. Few courts have addressed the question of what is a "special function governmental unit." In *Trustees of A.J. Bremen Realty Trust v. City of Boston*, 1985–1 Trade Cas. (CCH) ¶ 66,520 (D.Mass. March 12, 1985), [Available on WESTLAW, 1985 WL 6083], the court applied the LGAA to the Massachusetts Port Authority. The court looked to the legislative history of the LGAA and considered the fact that the Massachusetts legislature created the Authority as a "public instrumentality" and deemed the exercise of its powers to be an "essential governmental function."

Likewise, in *Palm Springs Medical Clinic, Inc. v. Desert Hospital*, 628 F.Supp. at 456–457, the court found that Desert Hospital, a hospital district established by the California Health & Safety Code, §§ 32000 *et seq.*, is a "special function governmental unit" for purposes of the LGAA. Again, the court looked to the legislative history of the LGAA and the manner of creation and regulation of the hospital district by the California legislature. In holding that the hospital district is covered by the LGAA, the court placed particular emphasis on the fact that the language of the LGAA and its legislative history are explicitly inclusive, not exclusive.

Congress did not define the characteristics of a "local government," but instead, included the broad language "any other special function governmental unit." The report by the House Committee on the Judiciary reporting the predecessor bill to the LGAA[8] also used inclusive language, stating that:

> [e]xamples of special purpose political subdivisions included within the definition are planning districts, water districts, sewer districts, irrigation districts, drainage districts, road districts, and mosquito control districts. Such a subdivision would have a geographic jurisdiction that is not contiguous with, and is generally substantially smaller than, that of the State that established it. The definition, however, would encompass special purpose governmental units that operate in more than one State. For example, regional planning boards, environmental organizations, or airport or port authorities may be established in two or more states. 1984 U.S.Code Cong. & Ad.News, 4602, 4620, 4621.

Thus, contrary to Zapata's argument, the legislative history specifically notes that the definition would not be limited to entities that have geographic definition, but "would encompass special purpose governmental units that operate in more than one State."

In the case at bar, Zapata described PRMSA as a "governmental unit." Complaint, ¶ 4. The Act creating PRMSA describes it as "[a] corporate and political body constituting a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico." Act, § 3054. The funds to cover an antitrust damage award against PRMSA (Zapata has prayed for $30,000,000 in treble damages) would be derived from the Puerto Rico Treasury and therefore, ultimately would be borne by the taxpayers. *See generally*, Eleventh Amendment discussion herein. Although PRMSA performs functions which are traditionally performed by private parties, its creation and operation was necessitated by the inability of the private sector to meet the public's needs. Indeed, the Act provides that the exercise of the powers vested in PRMSA "constitutes an essential governmental function." Act, § 3058. PRMSA performs a special governmental

---

**8.** The predecessor bill defined "local government" as a "city, county, parish, town, township, village, school district, sanitary district, or any other general or special purpose political subdivision of one or more States."

function by "maintaining a maritime transportation system for the benefit of the people of the Commonwealth, and for the protection of their health and welfare." *Id.* at § 3052. Accordingly, the Court finds as a matter of law that PRMSA is a special function governmental unit for purposes of the LGAA. Therefore, even if PRMSA were not exempt from antitrust liability under the state action doctrine, it would nevertheless be immune from antitrust damage liability based on the LGAA.

### Eleventh Amendment

■■■ Zapata's antitrust claims against PRMSA are also barred by the Eleventh Amendment's sovereign immunity doctrine. The Eleventh Amendment provides that:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. IX. Puerto Rico is considered a state for purposes of the Eleventh Amendment. *Ramirez v. Puerto Rico Fire Service,* 715 F.2d 694, 697 (1st Cir.1983). Under this amendment, a state is immune from suits brought in federal court by her citizens or citizens of another state, unless the state unequivocally waives its immunity or Congress has likewise unequivocally expressed its intent to subject the state to suit. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984).

■ Zapata argues that PRMSA has waived its Eleventh Amendment immunity by operating in interstate commerce. The cases Zapata relies on are inapplicable because they involve waiver of immunity under federal statutes unrelated to the federal antitrust laws.[9] Zapata has offered no evidence or law which would support a finding in this case that Puerto Rico has waived its immunity. Further, Congress

has not abrogated the sovereign immunity of the states as to claims under the Sherman Act. *Parker,* 63 S.Ct. at 313 ("The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state"); *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.,* 810 F.2d 869, 874 (9th Cir. 1987).

■ Eleventh Amendment immunity extends to a state entity when the suit is in reality a suit against the state itself. *Louisiana Land & Exploration Company v. State Mineral Board,* 229 F.2d 5, 7 (5th Cir.), *cert. denied,* 351 U.S. 965, 76 S.Ct. 1029, 100 L.Ed. 1485 (1956). To make this determination, the court "must examine the particular entity in question and its powers and characteristics as created by state law...." *Laje v. R.E. Thomason General Hospital,* 665 F.2d 724, 727 (5th Cir.1982). The Fifth Circuit focuses its inquiry on the following six factors:

(1) whether state statutes and case law characterize the agency as an arm of the state;

(2) the sources of funds for the entity;

(3) the degree of local autonomy the entity enjoys;

(4) whether the entity is concerned with local, as opposed to statewide, problems;

(5) whether the entity has authority to sue and be sued in its own name;

(6) whether the entity has the right to hold and use property.

*Darlak v. Bobear,* 814 F.2d 1055, 1059 (5th Cir.1987).

PRMSA's enabling Act does not specifically characterize it as an "arm of the state." It does, however, describe PRMSA as a "corporate and political body constituting a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico ...", Act, § 3054, which per-

---

9. The cases Zapata relies on are: *United Transportation Union v. Long Island Rail Co.,* 455 U.S. 678, 685–86, 102 S.Ct. 1349, 1354–55, 71 L.Ed.2d 547 (1982) (Federal Railway Labor Act); *Mills Music, Inc. v. State of Arizona,* 591 F.2d 1278, 1284–86 (9th Cir.1979) (Federal Copyright Act);

*Parden v. Terminal Ry. of Alabama State Docks Dept.,* 377 U.S. 184, 192, 84 S.Ct. 1207, 1213, 12 L.Ed.2d 233 (1964) (Federal Employers' Liability Act); and *United States v. California,* 297 U.S. 175, 186, 56 S.Ct. 421, 425, 80 L.Ed. 567 (1936) (Federal Safety Appliance Act).

forms an "essential governmental function," *Id.* at § 3058.

This Court is unaware of any case law dealing with the characterization of PRMSA with respect to the Eleventh Amendment. Zapata suggests that *Caribe, supra* and *Star Lines, supra* provide authority for finding that PRMSA is a separate and distinct entity from Puerto Rico for purposes of the Eleventh Amendment. *Caribe* and *Star Lines* declined to recognize PRMSA as the equivalent of Puerto Rico for purposes of the state action doctrine. As previously discussed, PRMSA is not entitled to absolute immunity under the state action doctrine simply by virtue of its status as a governmental entity. This is because PRMSA does not act as a sovereign entity; it only acts pursuant to authorization from a sovereign entity—the legislature. The question of whether PRMSA is entitled to sovereign immunity under the Eleventh Amendment does not involve examination of PRMSA's legislative authority to engage in the challenged conduct, but will depend on the extent to which PRMSA's characteristics show separateness from Puerto Rico. A governmental entity may be entitled to state action immunity, but not sovereign immunity, and vice versa.[10]

■ The most important inquiry in determining an entity's Eleventh Amendment immunity is the degree of financial autonomy the entity has from the state. In the Fifth Circuit, this inquiry focuses on "whether the funds to defray any award would be derived from the state treasury." *Laje,* 665 F.2d at 727 (citations omitted).

> One of the most important goals of the immunity of the Eleventh Amendment is to shield states' treasuries. *See Edelman v. Jordan,* 1974, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662, 672–73. The concern in the inquiry into the entity's financial autonomy is whether the judgment will be satisfied by the entity's funds or by state appropriations. As the Supreme Court stated, "[W]hen

the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit." *Ford Motor Company v. Department of Treasury,* 1945, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389, 394. The purpose of the immunity therefore largely disappears when a judgment against the entity does not entail a judgment against the state.

*Jacintoport Corp. v. Greater Baton Rouge Port Commission,* 762 F.2d 435, 440 (5th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986).

■ There is no genuine dispute that PRMSA is financially dependent on the Commonwealth of Puerto Rico for maintenance of its operations. PRMSA's audited financial statement for 1983–84 provides the following information:

> Since its inception the Authority has not been provided equity capital, and has been primarily dependent upon government support through direct loans and loans guarantees [sic] to finance its operations. Such continued support will be necessary to ensure the continuity of operations of the Authority. . . .

> During August, 1983, as part of the Commonwealth of Puerto Rico budget for fiscal year 1983–84, the Legislature approved a $13 million appropriation for the Authority in order to maintain its economic viability. Such appropriation was received and recorded as contributed capital. Also, an appropriation of $10 million was approved in the Commonwealth of Puerto Rico budget for fiscal year 1984–85. In addition, the Government Development Bank (GDB) has granted a moratorium in the payment of certain obligations of the Authority. . . .

Audit of Deloitte, Haskins, & Sells, Note 1, 1983–84. Similarly, the audited financial statement for 1984–85 provides that:

> As a result of initiating operations without any capital contribution and subse-

---

10. Of course, as previously mentioned, once one of these immunities is found to exist in a suit seeking only damages, such as the case at bar, any discussion of the remaining immunity is unnecessary. If the suit also seeks prospective injunctive relief, state action immunity will remain a viable issue, even though Eleventh Amendment immunity has been found to exist. *Cf. Edelman v. Jordan,* 415 U.S. 651, 664–65, 94 S.Ct. 1347, 1356–57, 39 L.Ed.2d 662 (1974).

quent significant losses incurred in operations ($59.5 million for the year ended June 30, 1985 and $198.2 million accumulated as of such date), the Authority has not been able to finance its operations solely through internally generated funds. Extensive financial support has been provided by the Commonwealth of Puerto Rico, principally through the Government Development Bank for Puerto Rico, in the form of extensions of credit, direct loans, loan guarantees ... and through contributions of capital ($10 million in 1985 and $13 million in 1984). Also, the Executive Branch of the Commonwealth of Puerto Rico has recently reaffirmed the importance it places upon the operations of the Authority in promoting the well-being and economic development of Puerto Rico; and, in this context, is committed to all measures which will enhance the Authority's economic viability.

*Id.*, 1984–85. The auditors concluded that "the Authority has incurred substantial operating losses and continuance of operations is dependent on receiving continued financial assistance from the Commonwealth of Puerto Rico." *Id.* at Auditors' Opinion. All tolled, since PRMSA began operations in 1974, the legislature and the Government Development Bank have provided a total of about $43 million of public funds to PRMSA's capital or forgiveness of indebtedness. *See* Affidavit of Diaz, ¶ 11. Thus, a large portion of PRMSA's funding is actually derived from Puerto Rico. In addition, Puerto Rico has guaranteed the payment of principle and interest on bonds issued by PRMSA up to $60,000,000. Act, § 3068.

Considering the extent of Puerto Rico's financial support for PRMSA and the amount of damages Zapata has demanded, the funds to cover any judgment would inevitably be derived from the Puerto Rico treasury. Also, if there were a judgment of the magnitude Zapata seeks against PRMSA, it is possible that Puerto Rico would have to decide between the alternatives of a writ of seizure being issued against PRMSA's assets or making additional appropriations to PRMSA. There can be no question that PRMSA's policies

and economic well-being would be significantly impaired if PRMSA were rendered defunct. *See Hall v. Medical College of Ohio at Toledo,* 742 F.2d 299 (6th Cir.1984), *cert. denied,* 469 U.S. 1113, 105 S.Ct. 796, 83 L.Ed.2d 789 (1985) (where the legislature annually appropriated operating funds based on the difference between the medical college's revenues and expenses, the court held that any judgment against the school would inevitably be paid from the state treasury). *Compare Jacintoport,* 762 F.2d at 441 ("even the most favorable estimation of Jacintoport's monetary damages does not reach a tenth of the Commission's surplus revenue in a 'good year'—of which it has had several recently. The State of Louisiana will not incur liability on *this* judgment's account." (Emphasis added)); *Blake v. Kline,* 612 F.2d 718, 726 (3d Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980) (where the state's only liability was in guaranteeing the entity's notes and bonds, the entity did not have Eleventh Amendment immunity). Clearly, the second factor militates in favor of Eleventh Amendment immunity because a judgment in favor of Zapata against PRMSA would require the payment of Puerto Rico funds.

PRMSA's enabling Act is again instructive with regard to the third factor, the degree of PRMSA's local autonomy. The Act endows PRMSA with broad powers to carry out and fulfill the purposes of the Act. Among PRMSA's powers are those generally granted to an independent agency: to sue and be sued in its own name, Act, § 3055(e); to make and execute contracts necessary to the exercise of its powers and functions, *Id.* at (h); to acquire, hold, and use property in its own name, *Id.* at (j), (k), (*l*); and to control and supervise all of its undertakings, *Id.* at (g). However, many of the provisions of the Act weigh against finding that PRMSA is an independent agency.

The legislature ultimately controls the organization of PRMSA's Governing Board since the Board's seven members are appointed by the Governor only after the Senate has given its advice and consent. *Id.* at § 3054. The status of PRMSA's

employees is similar to state employees. Employees of PRMSA are civil servants. They are covered by the Puerto Rico Civil Service Law, receive a government pension, and are paid by the Commonwealth from PRMSA's operating revenues.

The legislature made PRMSA exempt from taxation because "the purposes for which the Authority is created and shall exercise its powers, are the promotion of the safety, health and general welfare of the People of Puerto Rico, all of which constitute public purposes for the benefit of the People and that the exercise of the powers vested in the Authority under this chapter constitutes an essential governmental function." *Id.* at § 3058. PRMSA is also exempt from all fees required for the prosecution of judicial proceedings. *Id.*

PRMSA is required to submit an annual report to the Governor and the legislature. *Id.* at § 3073. In addition, the Comptroller General of Puerto Rico audits PRMSA on a regular basis for compliance with Puerto Rico laws. Affidavit of Diaz, ¶ 8. PRMSA is required to return net income, if any after provision of reserve funds, to the Puerto Rico Treasury annually. Act, § 3072. Certain purchases and expenditures in excess of $10,000 are subject to advertising for competitive bidding. *Id.* at § 3060. PRMSA has powers of eminent domain. *Id.* at § 3065. Considering the nature and extent of PRMSA's powers, this Court finds that the third factor, the degree of PRMSA's local autonomy, weighs in favor of immunity.

There is no dispute that PRMSA is concerned with statewide problems, as is evident by the Act's statement of public policy that PRMSA maintain an ocean transportation system for the people of Puerto Rico. *Id.* at § 3052. Thus, the fourth factor weighs in favor of immunity.

As previously explained, PRMSA has the express authority to sue and be sued in its own name and the right to hold and use property, so that the fifth and sixth factor weigh against finding immunity.

Having considered PRMSA's enabling Act, its powers and characteristics, particularly its performance of a vital state-wide governmental function, its sources of fund-

ing and financial dependence on Puerto Rico, and the fiscal and operational restraints imposed by the legislature, the Court finds that PRMSA is entitled to Eleventh Amendment immunity in this federal lawsuit.

There being no genuine issue of material fact, and PRMSA being immune from suit as a matter of law,

IT IS ORDERED that PRMSA's motion for summary judgment is GRANTED.