IT & E OVERSEAS, INC., Plaintiff,

v.

RCA GLOBAL COMMUNICATIONS, INC., Defendant.

Civ. A. No. 87–3089.

United States District Court, District of Columbia.

June 12, 1990.

Brian E. Moran, John H. Chapman, Chapman, Moran, Hubbard & Zimmerman, Stamford, Conn., Victor J. Toth, Reston, Va., for plaintiff.

Michael H. Salsbury, Anthony C. Epstein, Carl S. Nadler, Harry H. Rieck, Jenner & Block, Washington, D.C., for defendant.

MEMORANDUM OPINION

SPORKIN, District Judge.

In this private antitrust action plaintiff IT & E Overseas, Inc. ("IT & E") alleges that pursuant to a 1984 agreement defendant RCA Global Communications, Inc.

("Globcom") conspired with the Guam Telephone Authority ("GTA") to monopolize the Guam long distance telephone market. Plaintiff seeks damages for violations of Sections 1, 2, and 3 of the Sherman Act. 15 U.S.C. §§ 1-3. Currently pending before the Court are defendant's motion for summary judgment and defendant's motion for primary jurisdiction referral to the Federal Communications Commission ("FCC").

*Background*

Guam, an unincorporated territory of the United States, is under the general administrative supervision of the Secretary of Interior. *See* 48 U.S.C. §§ 1421-28e. Under the Organic Act of Guam, enacted in 1950, Guam is self-governing. The government of Guam consists of a 21-member Legislature and a civilian governor charged with general supervision and control of "agencies, and other instrumentalities of the executive branch of the government of Guam." 48 U.S.C. §§ 1422, 1423. Laws enacted by the government of Guam must be reported to the Secretary of the Interior, or any other official designated by the President, and may be annulled by Congress. 48 U.S.C. § 1423i.

Prior to 1950, the United States Navy was responsible for providing public utilities on Guam, including telephone service. After the passage of the Organic Act, the Navy transferred its responsibilities for the civilian portions of the island to the Public Utility Agency of Guam, the predecessor of GTA. In 1973, the Guam Legislature created GTA, a not-for-profit public corporation, and granted it the franchise to "install, maintain, sell and supply to individuals, firms, corporations and governments, including the Government of Guam, telephone service." 12 Guam Code Ann. § 7104. GTA was also authorized to establish "reasonable rates" for telephone service and to enter "into contracts and execute all instruments necessary or convenient in the exercise of all its powers." 12 Guam Code Ann. § 7104.

The U.S. armed forces still maintain facilities on Guam and own approximately one-third of the land on the island. Telephone service in these areas is provided by the U.S. Navy Public Works Center ("PWC"). Thus, two separate local telephone systems exist on Guam: the GTA system serving civilian areas and the PWC system serving military areas. Neither GTA nor PWC provides long distance telephone service to residents of Guam. Rather, the residents of Guam must subscribe to a long distance carrier. However, because all Guam telephone subscribers are connected to either GTA or PWC, their facilities must be used in every long distance call to or from Guam. In effect, a long distance carrier must depend upon access to GTA's local telephone exchange in order to originate or terminate calls from civilian areas.

From 1951 to 1983, defendant Globcom was the sole provider of long distance telephone service on Guam. Globcom provided its long distance service pursuant to interconnection agreements with GTA and PWC. Under these interconnection agreements, GTA and PWC forwarded outgoing long distance calls to Globcom and completed incoming long distance calls received from Globcom for a percentage of revenues Globcom derived from the calls.

In December 1982, IT & E received authorization from the FCC to enter the long distance telephone market of Guam. In April 1983, IT & E began to offer long distance telephone service in competition with Globcom. However, unlike Globcom, IT & E offered "dial up" service rather than direct dial service.[1] Neither Globcom nor IT & E carries long distance calls all the way to or from their ultimate destination. Both companies have agreements with "correspondent" carriers, such as AT & T and MCI, to forward outgoing calls to and receive incoming calls from the correspondents. Globcom and IT & E compen-

---

1. On Guam, direct dialed long distance calls are placed using a 3-digit access code. Customers of "dial up" service, on the other hand, do not use an access code to place a long distance call, but instead place a local call to their long dis-

tance carrier and then dial a Personal Identification Number ("PIN") for purposes of billing identification. Once the PIN is verified, the customer then dials the long distance call.

sate their correspondent carriers for handling outgoing calls and are paid by their correspondents for handling incoming calls.

Since January 1, 1979, Globcom has been provided with direct dial access to the local telephone exchange on Guam pursuant to a written traffic agreement between RCA and GTA ("Traffic Agreement"). This Traffic Agreement provided that Globcom would compensate GTA for providing local access on the basis of a division of revenues or a percentage of Globcom's Guam overseas long-distance telephone service revenues. Specifically, GTA received a percentage of Globcom's gross revenues for "paid-on-Guam" calls, increasing over the term of the Agreement from 34 to 35 percent.[2] The term of the original 1979 Traffic Agreement was for three and one-half years, until June 30, 1982, and was terminable upon 60 days notice by either party.

The 1979 Traffic Agreement has been amended three times. The first amendment was executed on May 23, 1979 and provided for Globcom to assume responsibility for its own billing and collection. The second amendment executed on July 1, 1981 after extensive negotiations provided, among other things, that: (1) the term of the Traffic Agreement be extended five years, until June 30, 1987; (2) termination be permitted only by mutual consent; (3) after June 30, 1984, GTA's compensation would be increased to 40 percent of Globcom's gross revenues for outgoing calls; and (4) Globcom pay GTA an "incentive fee" of $900,000 per year, provided GTA met certain minimal service obligations. It is the third amendment to the Traffic Agreement, executed on December 12, 1984, that is at the heart of the current dispute.

IT & E alleges that Globcom "secretly"[3] renegotiated its Traffic Agreement with GTA a third time in response to the initial success of IT & E following its market entry in April 1983 and to the competitive threat of GTA's prospective entry into the long distance market.[4] *See* Complaint at ¶ 35. This third amendment revised the Traffic Agreement in numerous ways. First, the amendment increased GTA's compensation to 50 percent of Globcom's revenues on outgoing and incoming calls, net of payments to correspondent.[5] *See* Third Amendment to Traffic Agreement ("Third Am.") at ¶ 1, attached as Exhibit to Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Mem."). Second, the term of the Traffic Agreement was extended seven years, until June 30, 1994. Third Am. ¶ 3. Third, the $900,00 per year incentive fee was eliminated. Third Am. ¶ 5. Fourth, Globcom was guaranteed "the right to interconnection services and facilities at least equal in type and quality to those which GTA provides to any other overseas message toll telephone carrier" and, if GTA entered the long distance market or outgoing GTA traffic on Globcom's system fell to less than 300,000 minutes per month for three consecutive months, Globcom has the right to interconnection at a price "no less favorable" than any other carrier. Third Am. ¶¶ 7, 8. Fifth, if GTA entered the long distance

2. Under the Traffic Agreement, "paid-on-Guam" calls include both calls where a GTA subscriber placed and paid for the call and where a call from overseas was placed to and paid for by a GTA subscriber.

3. IT & E contends that Globcom and GTA endeavored to conceal the 1984 amendment to the Traffic Agreement because, in a break with previous practice, Globcom did not file the 1984 amendment with the FCC.

4. On November 18, 1983, GTA applied to the FCC for permission to acquire facilities from Hawaiian Telephone Company for the purpose of providing long distance service between the Territory of Guam and the State of Hawaii and points beyond. Both Globcom and IT & E filed

petitions to deny GTA's initial application with the FCC.

5. IT & E asserts that it could not afford to purchase interconnections from GTA under the 50% net-revenue formula incorporated in the third amendment because IT & E, unlike Globcom, had very little inbound traffic and virtually no categories of exempt revenue under the formula. According to IT & E, GTA and Globcom purposely chose a revenue formula that was suited only to Globcom's particular circumstances and methods of operation because such a formula would be excessive and prohibitive for any other carrier.

business, it would route at least 300,000 minutes per month of outgoing traffic, including all traffic to destinations where GTA did not have a correspondent carrier, on Globcom's facilities. Third Am. ¶ 10. Finally, only long distance companies that "interconnect with GTA in such a manner as to provide the full range of overseas toll services that [Globcom] provides" would be listed in GTA's telephone directory instruction section.[6] Third Am. ¶ 15.

In a separate letter agreement executed concurrently with the Third Amendment, GTA and Globcom further agreed to jointly plan for the implementation of Automatic Number Identification ("ANI")[7] and to "consult and cooperate concerning customer service, marketing and advertising, to encourage use of the services available on Guam." *See* Letter Agreement dated December 12, 1984, attached as Exhibit to Def.Mem. The letter agreement also provided that "[t]his letter shall not be construed to limit either party's discussions, agreements or freedom of action with respect to any other communications service provider."

During 1985, GTA and Globcom each proceeded with plans to replace their existing switching facilities to obtain increased switching capacity and permit deployment of ANI. Representatives from both companies met periodically to discuss how their new switches would interconnect. Although GTA originally specified that its new switch would use the "CAMA–ANI" signaling protocol, GTA's new switch could not operate the specified protocol. On July 11, 1987, GTA's new switch was placed in operation. This new switch permitted implementation of ANI on Guam for the first time. However, GTA's new switch adversely affected IT & E's ability to interconnect with GTA's system. For a period, PWC subscribers could not place calls on IT & E and IT & E lost answer/disconnect supervision signalling. These difficulties allegedly resulted in a loss of subscribers for IT & E.

On November 13, 1987, IT & E filed suit against Globcom in this Court for violations of the federal antitrust laws.[8] On May 16, 1988, this Court denied both Globcom's motion to dismiss and Globcom's motion to transfer. On May 20, 1988, IT & E filed an amended complaint.[9] In its amended complaint, IT & E identifies GTA as an unnamed co-conspirator. ¶ 6. The amended complaint alleges that GTA, in furtherance of its conspiracy with Globcom, discriminated against IT & E with respect to the provision of GTA's monopoly local exchange access services. The amended complaint further alleges that GTA engaged in other discriminatory conduct against IT & E, including, but not limited to the following:

(a) GTA refused to file an access tariff in compliance with FCC regulations;

---

6. Because IT & E did not offer operator-assisted calling as did Globcom, GTA refused to list IT & E in the instruction section or "pink pages" of the GTA telephone directory. However, after negotiations, GTA agreed to place IT & E's advertisement on the inside front cover of its directory and to refer to the advertisement in Globcom's listing in the "pink pages."

7. In order to bill a long distance call, a carrier must identify the subscriber to be charged. ANI is a procedure that enables the local service provider's switching equipment to automatically forward the telephone number of the party to be charged to the long distance carrier. There are two other methods to identify the subscriber to be charged: Operator Number Identification ("ONI") and Personal Identification Number ("PIN"). ONI requires an operator to come on the line and request the billing information from the parties. With PIN, the billing information is recorded when a caller dials in the num-

ber of his or her personal account with the carrier. Prior to GTA's implementation of ANI, Globcom used the more cumbersome ONI procedure to identify the party to be charged.

8. Although GTA was originally named as a defendant in the first complaint, IT & E voluntarily dismissed the complaint as to GTA without prejudice pursuant to Rule 41(a) of the Federal Rules of Civil Procedure.

9. Globcom sought appellate review of the Court's denial of its motion to dismiss. On June 3, 1988, Globcom filed a petition for mandamus with the United States Court of Appeals for the District of Columbia which was denied. Globcom also filed a motion with this Court seeking certification for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). On July 28, 1988, this Court denied Globcom's motion for certification.

(b) GTA provided Globcom with preferable access by allowing Globcom a single three-digit access number "001" for direct-dialed calls and a single three-digit access number "002" for operator-assisted calls and refused IT & E's requests for similar three-digit access numbers unless IT & E capitulated to a 50% net revenue contribution;

(c) IT & E's requests for direct trunking between IT & E's switch and particular local exchanges were denied by GTA, notwithstanding the fact that such "premium" direct trunking was provided to Globcom, thereby resulting in the rerouting and diversion of traffic intended for IT & E to Globcom;

(d) GTA refused to provide IT & E with ANI capability as it did for Globcom, unless IT & E capitulated to a 50% net-revenue contribution;

(e) GTA refused to provide IT & E with "Answer/Disconnect supervision" ("ADS") capability as it did for Globcom, unless IT & E capitulated to a 50% net-revenue contribution;

(f) GTA and Globcom, pursuant to the terms of their "secret" 1984 Traffic Agreement, jointly designed and implemented new access technology, facilities, methods of interconnection, signalling, access codes, access features and equipment in a manner specifically intended to satisfy Globcom's particular requirements to the exclusion and detriment of IT & E whose interconnection requirements were purposefully impeded and frustrated in Globcom's and GTA's joint design of GTA's new exchange switches;

(g) GTA, pursuant to the terms of the "secret" 1984 Traffic Agreement, denied IT & E's requests to have an advertisement included in the "pink pages" of GTA's telephone directory;

(h) GTA deliberately engaged in a policy and practice of imposing delays on the processing and handling of IT & E's service requests.

Complaint at 21–22.

The amended complaint consists of five counts of alleged violations of Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. § 1–3: (1) an unlawful combination, contract and/or conspiracy in unreasonable restraint of trade in violation of Section 1 (Count I); (2) unlawful monopolization by Globcom in violation of Section 2 (Count II); (3) an unlawful attempt to monopolize in violation of Section 2 (Count III); (4) an unlawful conspiracy to monopolize in violation of Section 2 (Count IV); and (5) an unlawful combination, contract and/or conspiracy in unreasonable restraint of trade in violation of Section 3 (Count V).

On September 29, 1989, the Court heard argument on Globcom's motion for summary judgment. At the Court's request, an additional hearing on Globcom's summary judgment motion was held from November 20 to November 22, 1989. Subsequently, on November 29, 1989, Globcom filed a motion for primary jurisdiction referral to the FCC. Globcom contends that if the Court were to deny its summary judgment motion, a primary jurisdiction referral would be appropriate because the reasonableness of the third amendment to the Traffic Agreement—an issue within the jurisdiction of the FCC—would be a prerequisite to a trial on IT & E's claims. On February 1, 1990, the Court heard argument on this additional motion.

### Discussion

The Court first turns to defendant's motion for summary judgment. Globcom asserts three grounds in support of its motion for summary judgment: (1) under *Sakamoto v. Duty Free Shoppers, Ltd.*, 613 F.Supp. 381 (D.Guam 1983), *aff'd*, 764 F.2d 1285 (9th Cir.1985), *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1457, 89 L.Ed.2d 715 (1986), agreements with instrumentalities of the government of Guam are absolutely immune from federal antitrust attack; (2) Globcom's alleged efforts to persuade GTA to take the actions complained of by IT & E are protected under the *Noerr–Pennington* doctrine; and (3) IT & E has failed to present admissible evidence as required by *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987), to demonstrate that the alleged actions by

GTA caused antitrust injury to IT & E and were committed in concert with Globcom. Because the Court concludes that Globcom is entitled to summary judgment on the basis of the federal instrumentality doctrine, the latter two grounds for summary judgment will not be addressed.

### Federal Instrumentality Doctrine

██ It is well-established that the antitrust laws do not extend to actions of agencies or instrumentalities of the federal government, even when those agencies operate in competition with and to the detriment of private enterprise. *Sea–Land Service, Inc. v. Alaska R.R.*, 659 F.2d 243, 247 (D.C.Cir.1981), *cert. denied*, 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982). Moreover, private parties acting in compliance with clearly articulated government policies and programs are immunized from antitrust liability to the same extent as the government entity. *Southern Motor Carriers Rate Conf. v. United States*, 471 U.S. 48, 56–57, 105 S.Ct. 1721, 1726, 85 L.Ed.2d 36 (1985). *See also Caribe Trailers Sys. v. Puerto Rico Maritime Shipping Author.*, 475 F.Supp. 711, 724 (D.D.C. 1979) (when government agency is privileged to enter into agreement that might otherwise violate antitrust laws, those with whom it contracts are similarly entitled to antitrust immunity). Thus, in order for Globcom to prevail on its theory of absolute immunity, GTA must be considered a federal instrumentality for antitrust purposes.

The federal instrumentality doctrine has its genesis in the Supreme Court's decision in *United States v. Cooper*, 312 U.S. 600, 606, 61 S.Ct. 742, 744, 85 L.Ed. 1071 (1941), in which the Court held that the United States did not qualify as a "person" under the Sherman Act and, therefore, could not bring an action for monetary damages.[10] The Court noted that if the United States qualified as a "person" entitled to maintain a treble damage action, it would also qualify as a "person" subject to Sherman Act liability. *Id.* Congress responded to the

*Cooper* decision in 1955 by amending the Clayton Act to specifically authorize the United States to sue alleged antitrust law violators for actual, but not treble, damages. *See* 15 U.S.C. § 15a. Congress did not address whether the United States would be liable as a defendant under the antitrust laws. However, relying on *Cooper* and the Congressional silence concerning the United States' status as a "person" for antitrust liability, courts have subsequently held that the United States and its agencies and instrumentalities are not "persons" who may be held liable under the antitrust laws. *See e.g. Sea–Land Service, Inc. v. Alaska R.R., supra; Jet Courier Ser. v. Federal Reserve Bank*, 713 F.2d 1221, 1228 (6th Cir.1983).

Globcom contends that the Ninth Circuit's decision in *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285 (9th Cir. 1985), compels the conclusion that GTA is a federal instrumentality. *Sakamoto* involved a challenge to the legality of an exclusive concession agreement awarded by the Guam Airport Authority. In that case, the plaintiffs, a business competitor of Duty Free Shoppers, Ltd., the company which won the concession, sued the parties to the concession agreement: Duty Free, the Government of Guam, the Guam Airport Authority ("GAA"), and the executive manager of GAA. The Ninth Circuit, affirming the district court's dismissal of the antitrust claims, held that "the government of Guam is an instrumentality of the federal government over which the federal government exercises plenary control.... There is no reason why Guam should enjoy less immunity than the federal government itself." *Id.* at 1289.

After much thought, the Court concludes that GTA must also be considered a federal instrumentality. Were this a case of first impression, the Court may well have determined that because Guam is more closely analogous to a state, GTA is not entitled to absolute immunity under the antitrust laws as Globcom contends, but rather to the qualified immunity afforded to state and

---

**10.** Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, prohibit contracts, combinations, or conspiracies in restraint of trade or commerce and monopolization or attempts or conspiracies to monopolize trade or commerce by any "persons."

local governments. However, this is not a case of first impression; *Sakamoto* is squarely on point. Under *Sakamoto* the actions of GTA, like those of GAA, cannot give rise to antitrust liability. GTA is indistinguishable from GAA: both are public corporations created by the Guam legislature and run by a Board of Directors whose members are appointed by the Governor with the advice and consent of the Legislature.

The Court is not persuaded by the arguments made by IT & E to avoid the reach of *Sakamoto*. As IT & E notes, the antitrust implications of actions undertaken by local government instrumentalities of the District of Columbia and Puerto Rico, both U.S. territories, have not been treated as actions of federal instrumentalities.[11] Nevertheless, both the District of Columbia and Puerto Rico have different relationships with the federal government than the government of Guam.

The status of Guam and Puerto Rico cannot be equated: Puerto Rico is an incorporated territory while Guam is not. In 1952, "Puerto Rico ceased being a territory of the United States subject to the plenary powers of Congress as provided in the Federal Constitution. . . . [T]he government of Puerto Rico is no longer a federal government agency exercising delegated power." *United States v. Quinones*, 758 F.2d 40, 42 (1st Cir.1985). Rather, Puerto Rico has "the degree of autonomy and independence normally associated with States of the Union." *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 594, 96 S.Ct. 2264, 2277, 49 L.Ed.2d 65 (1976). Thus, *Sakamoto* expressly—and quite correctly—distinguished Guam from incorporated territories like Puerto Rico "which are thought of as future states." *Id.* at 1287.

IT & E's attempt to analogize Guam and the District of Columbia also fails. IT & E relies heavily on the D.C. Circuit's opinion in *Hecht v. Pro Football, Inc.*, 444 F.2d 931

(D.C.Cir.1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). *Hecht* involved an antitrust challenge to a provision of the D.C. Armory Board's thirty-year lease of Robert F. Kennedy Stadium to the Washington Redskins. Pursuant to its authority to legislate for the District of Columbia, Congress had provided for the construction of the stadium and created the D.C. Armory Board to operate the facility. After reviewing the history of the Armory Board's enabling legislation, which indicated that the Armory Board was meant to be treated like any private venture, the Court held that the lease was subject to the same antitrust constraints as those applied to private parties. *Id.* at 939, 942–946. Analogizing GTA to the D.C. Armory Board, IT & E argues that its antitrust immunity should be determined as if Guam were a municipality. Yet, subsequent cases in this Circuit have limited the holding of *Hecht*, demonstrating that its rationale does not apply to the circumstances of the instant case.

For example, in *Sea–Land Service, Inc. v. Alaska R.R., supra*, the D.C. Circuit applied the federal instrumentality doctrine in a suit alleging that a private corporation had conspired to monopolize Alaskan trade with the Alaska Railroad, an entity wholly owned and operated by the United States. The Court distinguished the Alaska Railroad, which it determined was a federal instrumentality, from the D.C. Armory Board, concluding that "[w]hile *Hecht* stands as this court's precedent regarding District of Columbia agencies such as the Armory Board, we hold that *Hecht* does not supply analysis appropriate in a case in which the activities of a United States instrumentality are at issue." *Id.* at 246–47. Similarly, in *Feldman v. Gardner*, 661 F.2d 1295, 1307 (D.C.Cir.1981), *vacated on other grounds*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), which involved an unsuccessful antitrust challenge to the

---

**11.** *See Hecht v. Pro Football, Inc.*, 444 F.2d 931 (D.C.Cir.1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972); *Caribe Trailer Systems v. Puerto Rico Maritime Shipping Authority*, 475 F.Supp. 711, 723–35 (D.D.C.1979);

*Star Lines, Ltd. v. Puerto Rico Maritime Shipping Authority*, 451 F.Supp. 157 (S.D.N.Y.1978); *Zapata Gulf Marine Corp. v. Puerto Rico Shipping Authority*, 682 F.Supp. 1345 (E.D.La.1988).

bar admission rules of the District of Columbia Court of Appeals, the Court distinguished *Hecht,* noting that the Armory Board "was commissioned to operate that facility as a private venture." In contrast, the instant case involves the conduct of a not-for-profit public corporation.

Equally important, the Ninth Circuit—the Circuit that has jurisdiction over Guam—has consistently chosen to treat Guam as a federal entity. As the Court stated in *Ngiraingas v. Sanchez,* 858 F.2d 1368 (9th Cir.1988), *aff'd,* —— U.S. ——, 110 S.Ct. 1737, 109 L.Ed.2d 163 (1990):

> Admittedly, the analogy between Guam and an administrative agency such as the Federal Trade Commission is counterintuitive. Guam seems more like a state or a municipality than a run-of-the-mill federal agency. After all, Guam elects government officials, its citizens participate politically and the territory enjoys many of the trappings of a sovereign governmental entity. *See* 48 U.S.C. §§ 1421–1424b. But there are also very significant differences, differences we deem conclusive for the purposes of the question presented to us. Guam marches squarely to the beat of the federal drummer; the federal government bestows on Guam its powers and, unlike the states, which retain their sovereignty by virtue of the Constitution, Guam's sovereignty is entirely a creation of federal statute.

*Id.* at 1371.

#### The Local Government Antitrust Act of 1984

Nor is the Court persuaded by IT & E's assertion that the force of *Sakamoto* has been eviscerated by the Local Government Antitrust Act of 1984, 15 U.S.C. §§ 34–36 ("LGAA"). The LGAA eliminated the damage remedy against local governments and private persons acting at local governmental direction. H.R.Rep. No. 965, 98th Cong., 2d Sess. 2, *reprinted in* 1984 U.S. Code Cong. & Admin.News 4602, 4603. Under the LGAA, local governments are defined as a "general function governmental unit" or a "special function governmental unit" established by "State" law, 15 U.S.C. § 34(1)(A–B), and includes U.S. territories within the definition of "State," 15 U.S.C. § 34(3). According to IT & E, therefore, the LGAA evinces a Congressional intent to treat U.S. territories, including Guam, as "states" for the purposes of the antitrust laws.

Yet in deciding *Sakamoto,* the Ninth Circuit expressly noted enactment of the LGAA, which because it had only recently been enacted was not applicable to that case, and did not suggest that it would have compelled a different result. 764 F.2d at 1288–89. Indeed, the Ninth Circuit has subsequently reaffirmed that *Sakamoto* remains good law. *See Ngiraingas v. Sanchez,* 858 F.2d at 1371–72. Furthermore, the LGAA was not intended to alter substantive antitrust law. Its sole purpose was to eliminate damages as an antitrust remedy against municipalities. *See* 1984 U.S.Code Cong. & Admin.News at 4603.

GTA clearly does not fall within the definition of either a "general function governmental unit" or a "special function governmental unit." [12] GTA is not a general function governmental unit because it provides only specialized telecommunication services rather than the broad range of services provided by cities and other examples of general function governmental units used in the statute. *See* 15 U.S.C. § 34(1)(A). Nor is GTA a special function governmental unit, because such units have only limited geographic jurisdiction within states; the definition of "local government" under the LGAA "does not include States or their agencies with State-wide jurisdiction." House Report at 19, 1984 U.S.Code Cong.

---

**12.** Despite IT & E's arguments to the contrary, *Zapata Gulf Marine Corp. v. Puerto Rico Maritime Shipping Auth.,* 682 F.Supp. 1345 (E.D.La. 1988) is inapposite. In *Zapata,* the Court held that the Puerto Rico Maritime Shipping authority was a "special function governmental unit" for the purposes of the LGAA and was therefore immune from antitrust damage liability. *Id.* at 1352. The federal instrumentality defense was not raised, however, and as the Court noted, "[t]here is no dispute that Puerto Rico is a state for purposes of applying the state action doctrine." *Id.* at 1348 n. 3.

& Admin.News at 4620; *see* 15 U.S.C. § 34(1)(B).

### Requirement of Valid Governmental Action

In a final effort to distinguish this case from *Sakamoto,* IT & E asserts that GTA is entitled to immunity as a federal instrumentality only if the challenged conduct constitutes valid governmental action. In support of its position, IT & E cites the district court's opinion in *Sakamoto. See Sakamoto v. Duty Free Shoppers, Ltd.,* 613 F.Supp. 381 (D.Guam). There, the district court noted that the federal instrumentality in question, the GAA, was acting "in accordance with the mandate of the Government of Guam when it entered into the exclusive airport merchandise concession agreement." *Id.* at 387. Accordingly, IT & E contends that GTA would not qualify for antitrust immunity under the federal instrumentality doctrine if its conduct was *ultra vires* or beyond the scope of authority conferred in its enabling legislation.

The simple answer to this argument is that the federal instrumentality doctrine provides *absolute* immunity. Thus, in *Sea–Land,* the seminal case which established the doctrine, the Court of Appeals held that "the United States, its agencies and officials, *remain outside the reach of the Sherman Act." Id.* at 246. *See also Howes Leather Co. v. Golden,* 681 F.Supp. 6, 15 (D.D.C.1987) ("the government, its agencies, and officials, are absolutely immune from antitrust liability per se"). Furthermore, IT & E has not succeeded in demonstrating that GTA's adoption of the third amendment to the Traffic Agreement exceeded the scope of its legal authority. GTA's enabling legislation authorizes it to provide interconnection services, establish rates for those services, and enter into contracts. *See* 12 Guam Code Ann. § 7104. Indeed, recent legislation on Guam demon-

strates that GTA has the authority to enter into private agreements.[13] *See* Guam Public Law No. 20–146, § 6 (1990), attached as Exhibit C to Defendant's Supplemental Memorandum in Further Support of Summary Judgment.

### The Definition of "Person" under 15 U.S.C. § 7

■ Finally, the Court rejects IT & E's argument that GTA is not entitled to immunity as a federal instrumentality because as a public corporation incorporated under territorial law it is a "person" under 15 U.S.C. § 7.[14] This argument does not survive scrutiny. In *Sakamoto,* the GAA was held to be a federal instrumentality despite the fact that it too is a public corporation incorporated under territorial law. Similarly, the Federal Reserve Bank, a public corporation with private shareholders, has also been held immune as a federal instrumentality. *Jet Courier Serv. v. Federal Reserve Bank,* 713 F.2d 1221, 1228 (6th Cir. 1983). *See also City of Loudon v. TVA,* 585 F.Supp. 83, 87 (E.D.Tenn.), *aff'd,* 754 F.2d 372 (6th Cir.1984) (TVA exempt from antitrust laws).

\*　　\*　　\*　　\*　　\*　　\*

The thrust of IT & E's complaint is that it was victimized by GTA actions pursuant to a conspiracy with Globcom. *See* Complaint at 21–22. But, as discussed above, the actions of GTA, a federal instrumentality, cannot give rise to antitrust liability. Therefore, Globcom is entitled to summary judgment on all claims based on the alleged combination or conspiracy between it and GTA. Accordingly, the Court finds that Globcom is entitled to judgment as a matter of law on Counts I (unlawful combination in violation of 15 U.S.C. § 1), IV (unlawful combination in violation of 15 U.S.C. § 2), and V (unlawful combination in violation of 15 U.S.C. § 3) of the amended complaint.

---

**13.** Section 6 of Public Law No. 20–146, enacted by the Guam Legislature in March 1990 states: GTA shall establish, subject to approval of the Public Utility Commission ("PUC") standard terms and conditions applicable to all agreements between GTA and companies providing long distance telecommunication services between Guam and overseas destinations.

**14.** Section 7 of the Sherman Act defines "person" to include "corporations and associations existing under or authorized by the laws of any State, or the laws of any foreign country." 15 U.S.C. § 7.

As a final matter, the Court turns to Globcom's motion for a primary jurisdiction referral to the FCC.[15] Because the Court has determined that GTA is a federal instrumentality and that its conduct is within the scope of its territorial enabling legislation, the Court need not consider the applicability to Guam of the FCC interconnection rules. As the Court has no need to refer this issue to the FCC, the motion for primary jurisdiction referral will be denied.

---

**15.** *Globcom seeks to have the following two questions submitted to the FCC:*
(1) whether, in light of the D.C. Circuit's decision in *All America Cables & Radio,* the Commission's interconnection policies in Docket 88–72, in particular its interconnection charge rules, have been extended to Guam; and
(2) if the FCC's interconnection rules have been extended to Guam, what price and other terms and conditions should the Guam Telephone Authority ("GTA) have established for both plaintiff IT & E Overseas, Inc. ("IT & E") and Globcom to obtain interconnections to GTA;s local telephone network.
*See* Defendant's Motion for a Primary Jurisdiction Referral to the Federal Communications Commission.